Case 23-5369, Brandenburg Telephone Company v. Sprint Communications Company. Argument not to exceed 15 minutes per side. Mr. Depp, you may proceed for the appellant. Good morning. Good morning, Your Honors. May it please the Court. My name is Tip Depp. I'm with the law firm of Dinsmore & Scholl in Louisville, Kentucky. I'm here today on behalf of Brandenburg Telephone Company. I'd like to reserve five minutes for rebuttal if I could, please. At its core, this case presents the Court with the question of whether under Kentucky law, the highest lawful rate of interest that can be assessed on a judgment against Sprint is the default legal interest rate of 8%. It is not. On the facts of this case, under the Brandenburg Telephone Tariff, in Kentucky law, 10.66% interest is the rate that the Court should have entered, the District Court. Therefore, we would ask that the Court please reverse the District Court's ruling and remand it with instructions to assess interest at 10.66%. Can I just try to get oriented a little bit? Speaking only for myself on the panel, expect a little cluelessness because this is so complicated to me, just how this all works. So I just want to get myself... Would you say the starting point is the statute? I would say the starting point is the tariff. Why would that be? Well, I guess I should clarify, which statute are we talking about? The statute that says the default rate, I guess it's 360.010.1, that says default legal rate of interest for commercial transactions at 8% unless, and then quote, any party or parties agree otherwise. So tell me if I'm getting a framing thing right. I say start there, and then I ask myself, okay, we know there's 8%, and so the whole point is I take it whether the tariff counts as an agreement to the contrary. Am I so far doing anything unfair about thinking about it? So I would suggest a slight tweak to that. The judgment interest would be under KR 360.040, subpart 3, it says the party's agreement will reflect the interest rate. The party's agreement is the tariff. So the real debate is whether the tariff counts as an agreement. That is part of the debate, correct. Why isn't that it? Because if I disagree with you on that, you want to back up? Is that the point, or you have a layered argument? No, the party's tariff under Sixth Circuit law, under all of the prevailing law, is the agreement. I mean, there's a Sixth Circuit case, not the Sixth Circuit Court of Appeals, but a Tennessee case. So I guess we'll maybe, I guess I'll just get to what my next question would be. Why would I call a tariff an agreement? I mean, like when I looked at this statute, I thought, okay, that makes sense. If you're silent, we go with eight. But hey, it's America. If the two parties to a transaction want to say, if you don't pay me on time, it's 10%, 12%, whatever. So I think we all agree that that's one function of the statute. And then I say, okay, but why is a tariff an agreement? I mean, it's a regulatory situation, and I don't think of regulated entities as agreeing to a lot. So I can give some color to that. So a tariff is effectively the statement of general terms that applies to the provision of the utility service. So it's an offer of terms and an acceptance of terms when the services are used. So it doesn't have a preamble and a signature block like a contract or an agreement would, but it has all of the same terms that apply to the rights and obligations of the parties. So for Brandenburg Telephone, it agrees to provide service on these terms. For Sprint Communications, it agrees to receive service on these terms and to pay in accordance with these provisions. So it is all of the provisions within that tariff are the same sorts of provisions that you would see in an agreement. Except that it's governed by the Public Service Commission, right? Correct. And the Public Service Commission is the one that actually approves. Correct. So the Public Service Commission has the duty, and under Kentucky law, it has exclusive jurisdiction to set intrastate rates. It's basically the utility monopoly. And if you're going to do that, you have to go through the Public Service Commission, and they set the tariff, right? The monopoly piece, I think, is not relevant to this. I would disagree with that. But in any event, yes, you do go through the Public Service Commission, whose job it is to balance the interests of the utility with the interests of the rate payer. And any time a tariff is filed, what the commission does is it generally will open a proceeding to review that to make sure that it believes that it's reasonable. The Attorney General of Kentucky has a statutory right to intervene on behalf of rate payers, the customers, to assert any interest it may have in any potential customer. But how is that an agreement? I mean, I don't feel like the – here, Sprint really has a choice as to – as it relates to the tariff. It doesn't have a choice as to what the rate is. Sprint has – if Sprint uses the services, correct, it is an automatic function that the terms of the tariff apply. Sprint had an opportunity if it thought the tariff was unreasonable at any point, as it did in 2009 or 2008, to complain about it. But – Has there ever been a complaint about the rate of interest? No. No, Your Honor. I mean, in one sense, all three of us have agreed to work for the federal government for the same salary. We did agree to it. We could stop tomorrow. But our capacity to – I don't think any of us would negotiate for less pay. Our capacity to negotiate for more pay is zero. Right. And I – so it's – I don't know that that's what we mean by agreement in this statute. Well, so there are two points. In the statute, it doesn't have to be an agreement entirely, right? I mean, one, I think the case law that we've cited in our briefing, particularly the Kuttner case in Tennessee, does reflect that the court has determined, with respect to Sprint specifically, a Sprint affiliate, that a tariff constitutes a contract between the customer and the utility. But – Spending clause legislation counts as a contract. Sure. A contract does not have to be negotiable to be a contract, right? There's an offer of those services, and if you want those services, then you accept them on the terms that are approved. But, again, I would broaden the court's inquiry a bit from the agreement principle, which I think the case law supports, also to the fact that the statute says that it may be any contract or other obligation in writing. And, clearly, a filed and approved tariff at the Kentucky Public Service Commission is an obligation in writing. You purchase access services from Brandenburg Telephone Company, you pay these charges, and if you don't pay them, you pay interest at these rates. And that's an obligation that's imposed by Kentucky law through the PSC's jurisdiction. How does this relate to the appropriate use of the statute? The district court said that the tariff is illusory for any contracted amount if we rely on your reasoning. You turn around and say, no, the statutes are illusory if you don't use my reasoning. Is there any way to harmonize those two positions? I don't know if there's a way to harmonize those two positions, but what I would say is the district court's interpretation effectively writes out the 10.66 provision of that agreement. And I understand the court's frustration. We had the same frustration, the district court's frustration, that we couldn't find a lot of cases. We had 10 pages and 10 days to brief it, and we did the best we could. And we were aware of the cases, as the court cited in its order, the Global NAPCS case and two others involving state laws that had hard caps on interest rate. But those laws are very different than Kentucky. And what we did do, we were able to find in the reply brief we cited to, it's the Beehive case from Utah, AT&T. Long, complicated history there. But the court in that case was interpreting tariff language that is virtually identical to the language here. And it's telling to me that in the opinion of the district court in that case, there was actually no real discussion of the application of the state law to that. And I think that's somewhat telling, because the provision in the tariff effectively contains a savings clause. So in a commercial contract, you want to say the interest is, for example, 1.5% per month, or the maximum amount allowed by the law, whichever is less. This is the same type of creature here, and that's the same type of language that the court was looking at in the Utah Beehive case. And what the court did there was assess the interest at the 10.66% rate. It's even the same exact rate. 10.66% rate, despite the fact that Utah law had a 10% default legal interest rate. What do you make of 2A, the levied by law language? Well, we've asked the district court to levy judgment on the interest amount that's due. I mean, one, I think levy is not, as Sprint contends, specifically a mandatory imposition, although that is clearly what we're trying to do, is to have the district court impose judgment. They're the one being too literal. Correct, correct. I mean, levy is used under Kentucky law, and we've cited the authority in our briefs, routinely in some cases for that mandatory approach, but in many cases simply to assess what the consequences of an agreement are. Oops, go ahead. I'm thinking of the Garrett v. Creekmore, Kentucky case, 1905, an old one, where the Kentucky Supreme Court appeared to distinguish between levies by law and levies allowed by law via private contract rights. Doesn't that case foreclose this argument that you're making? No, I don't think so, Your Honor. I mean, the best thing we can do, I mean, admittedly, the tariff scenario is a somewhat unique scenario, and it's not been the subject of a lot of reported decisions. But I think you've got to look at those cases. The district court's cases involving New York and Connecticut law had a hard cap there. The Utah case had virtually the same exact tariff language with a Utah law that allowed for a default interest rate lower than the specified number, but for the parties to agree. That's exactly what's happened here. How does that relate to the distinctions between levy conceptually and levy by law, which is what the 1905 case was speaking about, correct? I would view the tariff language as suggesting that it's levied by law for commercial transactions, which is why the $15,000 distinction that we have in our briefing is relevant here, not levy in the sense of an automatic imposition, levy in the sense of there's a commercial transaction that has a consequence that we're asking the court to enforce.  We'll hear from the other side. You'll get your full rebuttal. Thanks. All right. Mr. Williamson. Good morning. Good morning, Your Honor. May it please the court, Philip Williamson on behalf of Happily Sprint. Your Honor, the dual county tariff, as the court has already identified, sets the late payment penalty at the lesser of the highest legal rate of interest that may be levied by law on commercial transactions, or 10.66%. Kentucky permits parties to vary from a default interest rate of 8% only if they make an agreement in writing. And, Your Honor, starting with some of your questions, I think is where I'd like to jump off. And the first is that Kentucky law, if you want to vary the interest rate from that default rate of 8%, you must have an agreement. That is in the statute, in KRS 360.010, that the parties may agree in writing for a different interest rate. Contrary to what counsel suggested, you can't just skip down to Part B. You must have an agreement in writing to a separate interest rate. We have some case law that refers to this as an agreement, isn't there? Your Honor, so the- Tariff is an agreement. Thank you. Yes, to the tariff as an agreement. There is case law that refers to a tariff as an agreement. But it's in a far more colloquial rather than sort of strictly legal or term of art sense. The tariff, I think, as Judge Sutton has suggested, doesn't operate the way that any of us traditionally think of an agreement or a contract as operating. It is prepared unilaterally by the utility company that happens to have a monopoly on services to a particular area. It's filed with a state agency and is reviewed, enforced, and subject to revision by a state agency. That sounds an awful lot more like a statute than like a contract. For example, you wouldn't imagine going to a state regulatory agency or even to court to have the court revise the terms of an otherwise agreed to contract between the parties. That would be something that the parties would negotiate. When you're talking about revising the terms of the tariff by a state agency, we're really in statutory territory, not contract territory. In fact, you see this in the U.S. Supreme Court's case, the AT&T case we cited in that brief, where it talks about how under the file rate doctrine and the nature of tariffs, you're not really in contract interpretation territory. Can I ask a follow-up question on this point? So I take it the two of you would have common ground that however this case plays out, everyone would agree in the future in the relationship between the two parties that if you wanted to change the interest rate, you could have this side deal, or you two sign it, it's an agreement, and you say 10% is our deal. I take it we all agree they could do that? No, Your Honor. Outside the tariff, you couldn't just the two of you negotiate freely and just say, hey, if we're slow on paying, we'll do 10%? No, Your Honor. In fact, you cannot. Is that because you can't negotiate on top of tariffs? Is that the problem? Correct, Your Honor. The file rate doctrine forbids exactly that kind of sort of side deal making. And does that make the statutory provision illusory? No, Your Honor. Why not? You can talk about it. You can decide what you want. It just doesn't matter. Your Honor, it is true. The file rate doctrine means that you can't have side agreements. You can't have discriminatory or side. Then what does the Kentucky law grant of a right to respect and encourage the rights of private parties to contract with one another on this very issue? What does that mean? If we were talking about an actual contract between parties in the vast realm of commercial transactions that are not telecommunications tariffs, the parties could contract. Your point would be that the statute 360 has lots of applications. This just isn't one of them. Correct, Your Honor. Well, in part. The agreement in writing provision has no application here. Because of the file rate doctrine. And because the tariff is not an agreement of the type that 360.010 contemplates. It sets the default sort of usury interest rate in Kentucky. That does apply here because the tariff says the late payment penalty will be the highest interest rate that may be leveraged by law in Kentucky. But if you're talking about sort of more broadly the ability to contract for a different rate of interest, you're exactly right, Your Honor. That has applications for virtually any commercial transaction other than those governed by tariffs. Walk me through your textual analysis now of the tariff and how A and B work together. So A has to levy by law. So how does that work? Is there any way in which B has application? Absolutely, Your Honor. If the highest interest rate that may be levied by law in a state where this tariff operates is greater than 10.66%. So a clueless question, forgive me. I was thinking this was a tariff only in Kentucky. Am I just wrong about that? This language goes to other states. So the dual county tariff itself is limited to Kentucky. It is for governing. Okay, so now back to my point of B. How is that relevant? You're making the point this is language that's used in lots of tariffs and that's why it's here. And so be it that B is irrelevant in Kentucky? Is that the way to think of your argument, or what am I missing? Well, if the interest rate in Kentucky were ever higher than 10.66%, then under the terms of the tariff, the late payment penalty would actually be 10.66% rather than, for example, if Kentucky had a 12% interest rate, which Kentucky uses for default judgments on child support payments. So it is entirely possible and entirely conceivable that Kentucky would have a default interest rate of greater than 10.66%. And in an instance where Kentucky had a default or a usury interest rate that was greater than 10.66%, that is, if you go to A and the highest interest rate that may be levied by law is 12%, then the late payment penalty under the tariff would shift to B, that is, to 10.66%. What the tariff calls for is the lesser of A and B, A being whatever interest rate the state will normally allow you to charge, or B is 10.66%. How does your concession or your note or whatever you want to call the earlier letter you sent to Brandenburg that indicated, if you are paying us, you owe 10.66%, but now that you are paying Brandenburg, you say it is a lesser percentage? How does that work? You seem to have been thinking along their line when you were receiving the money. Well, Your Honor, the reality is that letter is not relevant to the court's analysis in this case, in large part because of the filed rate doctrine. Why is that not a judicial admission? Judicial admissions don't require magic words. They don't require a filing of we admit and agree on this. The law just says it can be a judicial admission in a number of circumstances. Why isn't this one one of those? Well, first of all, Your Honor, you don't see an argument from Brandenburg that it should be treated as a judicial admission. They start off making various estoppel arguments, and then there's an unclean hands argument that appears on appeal. But it's not been argued as a judicial admission. More importantly, Your Honor, it is because the task of the court here is to construe the tariff, and the tariff under the filed rate doctrine means what it means regardless of what the parties say. For example, if you had in front of you a contract agreement between Brandenburg and Sprint that under the Duro County tariff we agree that the interest rate shall be 11%, it would not matter because the parties cannot reach an agreement on a tariff-regulated service that varies from the terms of the published tariff. Even if it's considered a judicial admission, I understand your position that the other side isn't arguing that it's a judicial admission. But let's say that we consider it to be a judicial admission. Does that change things? No, Your Honor. If you deem it to be a judicial admission, then you have to decide whether 10.66% is going to be the late payment penalty for Sprint only or for all customers governed by this tariff. If you decide that it's for Sprint only, then you're effectively overruling AT&T and throwing the filed rate doctrine out because you are stating that, in fact, the parties can reach a side agreement, and in this case not even an agreement, that varies from the terms of the tariff. If you decide that on the basis of that admission 10.66% is the rate for all customers, then you're effectively saying that the actions, good or bad, of any one customer can set the terms of the tariff for all customers. But there's another way to look at that. The other way to look at it is that we have accepted your interpretation of the statutory provisions that you've been discussing with Chief Judge Sutton and that that is the correct interpretation for everyone. Right? It's a statutory interpretation determination. Your Honor, the task of the court is to decide what's the correct statutory interpretation of the tariff. And what if we say the first time you addressed this in your bill to Brandenburg, you told us what you thought the interpretation of the statute should be, and we agree. Your Honor, you can say that only if the court actually concludes that the right answer is 10.66. Right. But the court can't make that determination of its referring to. She's gone back to non-judicial admission world. Yeah. I'm into the statutory interpretation. And we say you told us this and we think you're right. That is the way this statute should be interpreted for you and everyone else subject to this tariff. That's what it means in Kentucky. Well, Your Honor, you'd have to make that decision completely separate and distinct from how you know it. That's exactly what I'm positing. I'm not helping you. But I think that would be incorrect. Take the word admission out of your head. She's now back to interpreting the tariff in the statute. In other words, you can still lose by filing interpretation. So get back to discussing interpretation. Your Honor, I think there are a series of problems with Brandenburg's tariff position here. The first is you have a tariff provision that says the lesser of A or B. And the court would have to conclude, to apply 10.66 right here, that the lesser of A or B is actually an agreement in writing to simply use B. And that is circular if you look at the way you have to then read Kentucky statutes. And it's not the way that anyone thinks about a lesser of A or B proposition. The second is the court would have to conclude that the tariff itself is in fact an agreement, which I think as we've discussed is a difficult lift. The court would have to conclude that it's an agreement to a particular interest rate. And as we pointed out in our brief, this is about a late payment penalty. It is not an agreement about an interest rate in contrast to other provisions of the Duo County Tariff that do in fact refer to interest rates. It's not unlike the first Affordable Care Act case where the court had to determine whether penalty was an intentional choice to take a statute out of the Anti-Injunction Act. Similar here, where if Brandenburg had intended for this provision to operate as an agreement to an interest rate, they should have called it an interest rate, as they did in other provisions, rather than a late payment penalty. And then finally, if the court jumps through those hurdles, the court would then have to find that this lesser of A or B is actually an agreement in writing to simply B. And I think the argument, Brandenburg's argument, fails at sort of each one of those steps. And so I think getting to, you know, we agree that 10.66% is the rate, is actually a difficult lift here. No other questions, your honors. I will take my seat. Thank you very much. Mr. Depp, you get your rebuttal. Thank you, your honors. I appreciate the court's questions about Sprint's admissions, because I had hoped we would talk some about that. Was it an admission when you didn't, you seemed to accept what they said? You didn't protest. We have not protested at being 10.66, because we believe that's the rate, correct. And so what is interesting to me is that Sprint, in response to a motion for summary judgment filed in 2009, when it was the perceived victor, filed the affidavit of one of its employees, who is responsible across the nation for dealing with these sorts of billing things and dealing with tariffs that address this. And as we've seen in the case law that's cited, a lot of these tariffs have similar language. Wasn't this an effort to try to resolve this dispute outside of litigation? No, it was an effort to impose Sprint's will to collect what it perceived was a favorable judgment. It was, one, it was Sprint's full amount. And we responded with a motion for rehearing at the Public Service Commission and then appealed through the state courts. There was no further correspondence on that. Now, in the underlying proceeding here in the district court in 2009, when there was a motion for summary judgment that Brandenburg Telephone filed to recover even the undisputed parts of charges, Sprint indicated that no. Sprint's view is, we're going to offset everything. I think they used the term accounting mechanism. We're going to offset against what you say we owe you. And in order to calculate the amount of the offset, we're going to apply interest in accordance with the tariff. And it did that through the spreadsheets at 10.66%. And Sprint has never recoiled from that. What's your response to his point about the filed rate doctrine approach to this? In other words, if you're right that you can have a stop of admission, whatever it is, you suddenly have a situation where one party or two parties are outside. And it really becomes a side agreement. I mean, why isn't it that we just got to figure out what this means? I agree with you. We do need to figure that out. Where does the admission enter into it if we're supposed to figure it out for everybody as opposed to two parties? It is both an admission, Your Honor, and a reflection of Sprint's understanding throughout history that the interest rate was 10.66%, which is the number that's in the tariff. It's like a Chevron deference point? How does it enter into a judge's mind when the judge is supposed to figure out what all these words mean? I don't normally defer to parties as to the meaning of statutes and agreements. Correct. So the court would, I assume, give deference to the Public Service Commission, as it's the exclusive regulator of these sorts of rates, and has to interpret, well, why did it have that 10.66 rate in there? At the time that tariff was approved in 1999, the default legal interest rate was 8%. It was lower. I mean, I appreciate counsel's arguments, but what Sprint is asking the court to do is to say that the commission included language that had no effective meaning at the date it approved it. The commission doesn't do useless things. It approves things that have effect. And so in the case here, where the debt is above the $15,000, there's a clear language. I like to look at it from the backwards perspective. Ask the question, is 10.66% unlawful under Kentucky law? No, it's not. Parties have an agreement through that tariff. The rate is specified right there. Sprint knew it. Sprint understood it. That's premised on agreement in relation to the statute? Correct, correct. But Sprint saw it. Sprint understood it. Sprint knew it. Sprint advocated for it until it lost. And therefore, the court should enforce it. It's a savings clause. If we just set that aside, as Chief Judge Sutton had suggested, and go back to interpreting the statutory language. Your opposing counsel says you cannot interpret it that way because you've got these three or four steps and you lose at each of them. Can you quickly walk through why that is an appropriate interpretation of the statutory language that you get 10.66%? Certainly. 360.010 subpart 1 says any party or parties, we've got one or multiple, that's clearly present here, may agree in writing. Let's break it down further. May agree the commission sets the terms of the party's agreement through its review of the tariff. The tariff was approved. Therefore, there is the agreement. In writing, the tariff is clearly in writing at the Public Service Commission. For the payment of interest, Sprint apparently takes some dispute with the fact that the late payment penalty here is not described as the actual word interest. Yet it concedes in its briefing multiple times that it is, quote, effectively interest. And sister courts have interpreted similar language the same way. There's case law going both directions. We know that. And therefore, it allows the parties to agree to a rate in excess. All right. Thanks to both of you. We don't get this kind of case every day, so we really appreciate really excellent briefing and great arguments. And thanks for answering our questions, for which we're always grateful. Thank you, Your Honors. All right. Thank you. The case will be submitted.